# Booker and Knight *et al. v.* Waller.

*Bill in Equity by Mortgagor for Redemption and Account.*

1. *Rescission of contract by agreement.*—When provision is made in a written contract for its rescission on the happening of a future contingency, the effect of the rescission, when the contingency happens, is to place the parties in *statu quo,* in the absence of stipulations to the contrary.

2. *Earnings of wife.*—The earnings of the wife, during coverture, belong to the husband; and he can not give them to her, nor invest them in any way for her benefit, to the prejudice of his creditors, or persons to whom he is under any legal obligations.

3. *Estoppel by warranty in deed, passing future interest acquired.* When a grantor in a conveyance, with covenants of warranty, has not a perfect title at the time, but afterwards acquires it, his after-acquired interest passes and enures to the benefit of the grantee.

4. *Right of redemption by mortgagor, as against wife of mortgagee claiming under subsequent transactions.*—Where the purchaser of a tract of land, having received a conveyance and executed a mortgage for the unpaid purchase-money, resold a portion of the land to a sub-purchaser, who received a conveyance, was put in possession and executed a mortgage for the unpaid purchase-money, payable in installments; the original purchaser using the partial payments made by the sub-purchaser, and the proceeds of the crops grown on the lands, in making partial payments on his unpaid notes; after which, the original vendor having foreclosed his mortgage, becoming himself the purchaser at the sale, the original purchaser continued in possession as his tenant, and, through the intervention of a third person as agent or trustee, made an executory contract of purchase in the name of his wife, which contract was terminated and rescinded, by its own terms, on a redemption of the land by a judgment creditor of the original purchaser and mortgagor, with whom, through the agency and intervention of the same third person, a new contract was made for the benefit of his wife; *held*, on these facts, in the absence of any proof that payments were made by the wife, or out of funds belonging to her, the equitable right of the sub-purchaser to have a redemption and account must prevail over any equity acquired by the wife of the original purchaser.

APPEAL from the Chancery Court of Hale. ·

Heard before the Hon. THOMAS COBBS.

The bill in this case was filed by the appellee, Virginia J. Waller, the wife of Robert B. Waller, against said Robert B. Waller and the appellants, William N. Knight, Eva H. Knight, Edward W. Booker and Martha K. Booker, and prayed that an account be taken and stated, charging appellee with the amount due and unpaid by her on the purchase-money of certain lands, and charging appellants, William N. Knight and Edward W. Booker, with the rents and profits of said lands received by them, and that appellee, as mortgagor, be allowed to redeem said lands, and for general relief.

The material facts are stated in the opinion.

A decree of reference was rendered, requiring the register: "1. To take an account of the amount due E. W. Booker and Wm. N. Knight on the note and mortgage of complainant and Robert B. Waller. 2. To take an account of the annual rents of the lands described in the bill from the time said Booker and Knight were let into the occupancy thereof, and to make annual rests and to appropriate the annual rents, first to the discharge of the interest due on said note and mortgage and then to the reduction of the

principal. 3. To ascertain the amount of taxes paid on the lands by said Booker and Knight each year since their occupancy, and credit the amount on each year's rent. 4. To ascertain what necessary repairs have been made on the premises for the preservation of the property by said Booker and Knight, and their value, and credit the ascertained value on the rent account; but to make no allowance for improvements further than to keep the property in necessary repair; and not to charge said Booker and Knight with any increased value of the rents, by reason of any permanent improvements placed upon the property and for which they are not allowed a credit. 5. To report to the next regular term of the court how much is due on said mortgage debt after making the deduction as above directed; and, if the amount of rents after deducting taxes and necessary repairs, exceeds the amount due on the note and mortgage, to report the amount of the excess."

The appellants filed exceptions to the decree of reference, and, also, to the rulings of the register on the reference under the decree sustaining complainant's (appellee's) objections to the following questions to witnesses : "1. About what is the worth *per annum* to keep such a farm in necessary repair, in the condition it was in in the year 1875 ? 2. What would be the cost annually of keeping the place in a reasonable state of repair, exclusive of any repair on permanent improvements made by the defendants ? 3. (To E. W. Booker). Have you since this reference commenced, referred to any written correspondence, had by you for the purpose of refreshing your memory, which enables you to speak positively as to the amount of rent agreed to be paid? 4. (To W. N. Knight). What is a fair compensation for your services in renting out that part of the land in controversy, each year which it was rented out, and for superintending the renters and collecting the rents ? 5. (To W. N. Knight). How much or what proportion of the cotton agreed to be paid each year by the renters of the land in controversy, was in consideration of, and in payment for, the risk you took in advancing and your superintendence given them in making their crops ? 6. (To E. W. Booker). State whether or not in your opinion, the construction of a gin house and screw on the place in controversy, was necessary to the use and cultivation of the same as a cotton plantation, and if so, why was it ? 7. (To E. W. Booker). Without a gin house and screw for the ginning and packing of cotton raised on the place, and no public ginnery any where near it, could the place, in your opinion, have been rented for anything like or near its rental value ? 8. What is a fair rental value

of the land in controversy since 1875? 9. (To W. N. Knight). In the condition in which the place was, were not each and all the repairs necessary for its use and cultivation? 10. (To W. N. Knight). Could you have obtained and retained tenants on that place without a gin house and screw to gin and pack the cotton?"

The appellants, also, filed an exception to the register's overruling appellant's objection to the following questions: "What is the reasonable rental value *per annum* of the tract of land involved in this suit, exclusive of improvements, but in a reasonable state of repair for agricultural purposes?"

The testimony before the register as to the annual rental value of the land from 1875 to 1884, both inclusive, the period of its occupancy by Booker & Knight, was voluminous and conflicting, and range from $375.00 as the lowest, to $1400.00 as the highest, estimate.

The register in his report charged the appellants, E. W. Booker and W. N. Knight, with rent of the lands for the years from 1875 to 1884, both inclusive, and the appellants filed exceptions to their being charged rent for the year 1875, and, also, to the amounts charged as rent for each of the years, from 1876 to 1884, both inclusive.

The register's report showed a balance of $1,158.95, in favor of Booker & Knight. The chancellor's decree confirmed the report and rulings of the register and ordered, among other things, that, on payment of the costs of the case, and said balance of $1,158.95, with interest thereon to appellants, all the title and interest of appellants in the lands be divested out of them and vested in appellee; but that on failure to make such payments, the lands be sold by the register for the payment of the costs and said balance.

The appellants filed exceptions to each of the above provisions of the decree.

A. A. COLEMAN and BROOKS & ROY, for appellants.—1. The bill and the relief prayed for are upon the allegations and idea, that the relation of mortgagor and mortgagee existed and continued to exist between the complainant and Booker and Knight, on and after the 3rd day of May, 1875, and that they held possession of, and enjoyed the land as such mortgagees; and that therefore they are accountable to complainant for rents. 2. The Walton mortgage created the prior and superior lien upon the land. All the right and title of complainant was subject and subordinate to that mortgage. If by a sale under that mortgage, on the 3rd of May, 1875, the relation of mortgagor and mortgagee,

between the complainant and Booker and Knight, was destroyed and never afterwards restored, the complainant is not entitled to any relief. 3. The sale of the land on the 3rd day of May, 1875, under the Walton mortgage, cut off the equity of redemption; and by the deed then made to Garrett, the purchaser, the legal and equitable title to the land was vested in him as sole owner. And by his deed of conveyance to Walton on the 5th day of May, 1875, the legal and equitable title was vested in Walton as sole owner. The necessary—the inevitable effect was to destroy the relation of mortgagor and mortgagee, which had existed between Booker & Knight and the complainant. 4. Any subsequent possession and control of the land by Booker & Knight, would not properly subject them to accountability to complainant for the rents, unless and until the relation of mortgagor and mortgagee between them and the complainant was restored. She might claim damages for the breach of the covenants contained in the deed, executed to her by Booker & Knight for the land, but certainly she could not be entitled to the benefit of the rents until the said relation was restored; and then only to the value of such rents as accrued after and during the restoration of such relation. It was not restored at any time after the 3rd of May, 1875. 5. It is equally clear that the relation of mortgagor and mortgagees between Booker and Knight and the complainant, was not at any time restored after the 1st day of January, 1876. The undeniable and undisputed effect of the redemption of the lands by Sims and Harrison and the deeds of conveyance for the same by Walton to them on that day was to vest in them the legal and equitable title, and make said Sims & Harrison the *exclusive owners* of the land. 6. The transactions with Sims and Harrison do not show, or tend to show, that Booker and Knight thereby acquired any right or title to the land, or that the relation of mortgagor and mortgagees was thereby restored between them and the complainant, or that they occupied the land and received the rents as her mortgagees. On the contrary, the land was the statutory separate estate of their wives; they managed and controlled it, as their husbands and trustees and not otherwise, under and in subordination to a title adverse and paramount to that of complainant. 7. But the counsel for the complainant tell us that the crops raised on the premises under this contract belonged to Booker & Knight; that the purchase-money was paid to Sims and Harrison out of the proceeds of those crops; and that, therefore, the land became in equity the property of Booker & Knight, and therefore the property in controversy became

the property of complainant, and that thereby the relation of mortgagor and mortgagee between her and Booker and Knight was restored, and fastened upon them the equitable liability to account to the complainant for rents from the 1st day of January, 1876. But suppose the purchase-money was paid out of the crops, what difference does it make? The wives, by virtue of the contract of P. N. Booker for them, and its assignment to them, acquired an equity to the lands on the payment of the purchase-money. "This equity was their statutory separate estate, incapable of alienation except in the mode prescribed by the statute." *Wimbish v. M. L. A. P.*, 69 Ala. 575; *Sharpe v. Sharpe*, 76 Ala. 320; *Prout v. Hoge*, 57 Ala. 28; *Tyler on Inf. & Cov.*, page 641 to 650; *Bottom v. Handy*, 5 Heiskell (Tenn.) 1. If the purchase-money for the land was paid out of the crops and a perfect legal title vested in the wives by the deed of Sims & Harrison, this did not make the land the property of the husbands and divest the wives of the equity aforesaid, which "equity was their separate estate." "The labor and attention of the husbands bestowed on its management was the discharge of a duty imposed by the statute upon them as trustees, and the rents, income and profits were not subject to the demands of complainant;" and the use of such income and profits in paying for property purchased for, and in the name of the wife, does not deprive her of her statutory estate, or subject it to the demands of those who may have claims against the husband. The statutory separate estate of the wife is incapable of alienation by such means.—*Adams v. Sayre*, 76 Ala. 509; *Hoot v. Sorrell*, 11 Ala. 387, 407; *Dayton v. Walsh*, 47 Mo. 113.

THOS. SEAY, THOS. R. ROULHAC, and WHITE & WHITE, *contra*.—When one sells lands (having no title) and warrants the title and afterwards acquires a good title, it inures to the benefit of the grantee.—*Kennedy v. McCartney*, 4 Port. 158; *McGee v. Eastis*, 5 S. & P. 440; *Chapman v. Abrams*, 61 Ala. 114; *Bashil v. Mobile*, 57 *ib.* 208: *Stewart v. Anderson*, 10 *ib.* 504. If a wife accept a gift from her husband, she takes it subject to the just claims of others to the land as against the husband and all the equities of good faith and fair dealing.—*Goree v. Walthall*, 44 Ala. 61. The earnings of the wife belong to the husband.—54 Ala. 467, 244; 56 *ib.* 379. A mortgagee in possession must account for rents to be applied to the mortgage debt.—58 Ala. 147; 65 *ib.* 510; 1 Hill on Mort. 439–447; 59 Ala. 535. "In case of a purchase by the wife after marriage, rigid proof is re-

[Booker and Knight *et al.* v. Waller.]

quired from her, that she paid for the property purchased with funds not furnished by the husband. Evidence that she purchased amounts to nothing, unless it be accompanied by clear and full proof that she paid for the property with her own separate funds."—*Aurand v. Schaffer*, 7 Wright (Pa.), 363; *Gamber v. Gamber*, 6 Harris, 363; *Keeney v. Good*, 9 Harris, 349; *Hause v. Gilger*, 2 Smith (Pa.), 412; *Gault v. Saffin*, 8 Wright (Pa.), 307. *Prima facie* the possession of the wife is the possession of the husband, and what she invests is his property.—*Winter v. Walter*, 1 Wright (Pa.), 155. "It is only when the property acquired after marriage has been paid for with her own separate estate, clearly and satisfactorily established, it is the wife's and is protected from her husband's creditors."—*Barringer v. Stiver*, 13 Wright (Pa.), 129, 132, 133; *Hallowell v. Horter*, 11 Casey (Pa.), 375; *Robinson v. Wallace*, 3 Wright (Pa.), 129; *Glover v. Alcott*, 11 Mich. 470. The interposition of a trustee does not affect the true *status.*—*Early & Lane v. Owens*, Ala. Law Journal, Aug. & Sept., 1881, p. 458. "Creditors trust their debtors on the faith, not only of their present property, but of their future acquisitions, whether made by their labor and skill or otherwise; and they have no right to devote either to the separate use of their wives in exclusion of the claims of creditors. A debtor is under a high obligation to support his family; but he is under a still higher obligation to pay his debts." —*Penn v. Whitehead*, 12 Grat. 74, 80; *Wilson v. Loomis*, 55 Ill. 352, 354; *Bucher v. Ream*, 18 Smith (Pa.), 421; *Glidden v. Taylor*, 16 Ohio, 500; *Fellen v. Alden*, 23 Wis. 301–5. The principle of the foregoing cases are adopted by the Supreme Court of Alabama in *Wilder Bros. v. Abernethy*, 54 Ala. 644.

STONE, C. J.—The present suit is a bill by Mrs. Waller, mortgagor, to redeem the tract of land, four hundred and eighty acres, described in the pleadings. The real contention is, whether the lands are, so far as the rights of Mrs. Waller are concerned, in equity and good conscience, the property of Mrs. Booker and Mrs. Knight, in whom the title has become vested, or in W. N. Knight and E. W. Booker, their husbands, to whom Mrs. Waller executed her mortgage to secure the payment of the purchase-money. The chain of precedent facts and transactions leading up to the present controversy, is somewhat varied and complicated. A brief summary is necessary to a correct understanding of the main question at issue.

In 1870 one Walton was the owner of a tract of land known as the Peck place, containing near thirteen hundred

[Booker and Knight *et al.* v. Waller.]

acres. He contracted with Booker and Knight, the husbands, to sell them the lands at the gross sum of twenty-six thousand seven hundred and forty dollars; the contract dated December 29, 1870. By the terms of the purchase Booker and Knight were to pay ten thousand dollars February 1, 1871, and were then to receive title, conveying the lands to secure the balance of the purchase-money in one and two years. The first payment was made, deed and mortgage executed, and Booker and Knight went into possession. On December 29, 1870, same date, Booker and Knight contracted with Mrs. Waller to sell her four hundred and eighty acres of the land for nine thousand six hundred dollars, and put her in possession. She bound herself to pay the purchase-money in three installments—the first, thirty-eight hundred dollars, due January 15, 1871, and the residue in one and two years afterwards. Partial payments were made on Mrs. Waller's purchase; and on December 23, 1872, the parties came together, had a reckoning, and it was ascertained that, including interest, there would be due on Mrs. Waller's purchase January 1, 1874, four thousand four hundred and thirteen 79–100 dollars. The residue had been paid. Booker and Knight, with their wives, thereupon executed to Mrs. Waller a deed to the lands she had purchased, with full covenants of warranty, and contemporaneously she, with her husband, conveyed them back by mortgage to secure the payment of the balance of the purchase-money. Mrs. Waller, with her husband, occupied the lands for four years, and until the close of the year 1874, during which time there had been paid of the residue of the purchase-money only one hundred dollars.

In January, 1873, Booker and Knight sold and transferred Mrs. Waller's note and mortgage to McCrary, and realized its agreed value. On January 1, 1875, Mrs. Waller surrendered the possession of the premises to McCrary, the holder of her note and mortgage, on an agreement that the latter should let the premises to rent, and apply the rents to the payment of the debt secured by the mortgage. McCrary thereupon let the premises for the year 1875 to Booker & Knight, at an agreed rental of ten or twelve bales of cotton, and the latter went into possession as tenants of McCrary. The possession has never been restored, either to McCrary, or to Mrs. Waller, nor have Booker & Knight ever paid rent to any one.

The mortgage from Booker & Knight to Walton contained a power of sale; and on May 3, 1875, Walton, after giving the required notice, sold the entire premises conveyed by the mortgage, including the land sub-sold to Mrs. Waller,

for the sum of about eleven thousand dollars, the sum then due to him on Booker & Knight's purchase and mortgage. Walton was the indirect purchaser at his own sale, conveying title first to his agent, Garrett, and the agent immediately reconveying to him. No question is raised on the irregularity of this purchase, for Booker & Knight, on demand of possession being made on them, acknowledged his possession, and accepted employment under him. By the terms of that employment they agreed to superintend the plantation for Walton's agent for that year, 1875, and to receive for their compensation a sum not to exceed one-third of the net profits of the cotton crop, to be determined by agreement or arbitration.

On June 14, 1875, another contract was entered into between Walton, the purchaser at the mortgage sale, and P. N. Booker, brother of E. W. Booker, of Booker & Knight. By that contract, Walton agreed to sell, and P. N. Booker to purchase, the entire property, real and personal, which the former had bought at the mortgage sale, at the sum paid by Walton, with interest added; the payment to be made in three annual installments, the first one maturing January 1, 1876, for near six thousand dollars. The agreement of sale and purchase contains the following clauses:

" *Provided,* however, and it is expressly agreed, that if the said property should be redeemed within two years from the 3d May, 1875, by any person or persons legally entitled to redeem the same from the said John W. Walton, then this agreement and conveyance shall be deemed satisfied; but in such event the said John W. Walton shall repay any amount then already paid to him on said purchase-money by the said Parham N. Booker, and shall return to him any outstanding, unpaid promissory notes given for the same. . . . Said Booker further undertakes and agrees to secure and retain on said Peck place the personal services and management of said Edmund W. Booker and William N. Knight during the years 1875 and 1876, and that all the net proceeds of the cultivation of said Peck place shall be applied on the promissory notes given by him for the purchase therefor; and that to secure this, the title to said crops shall remain in the said John W. Walton, and the same shall be subject to his control and disposition, either in person, or by his agent or attorney."

On January 1, 1876, Sims & Harrison, judgment creditors of Booker & Knight in the sum of about five thousand dollars, perfected a redemption of the entire Peck place from Walton, by paying him the amount of his purchase and proper interest; and they received his conveyance of the

[Booker and Knight *et al.* v. Waller.]

lands accordingly. P. N. Booker had paid Walton nothing on his purchase from him, nor did Walton receive any of the crops grown in 1875, either as owner, mortgagee, landlord, or vendor to P. N. Booker. He did realize a part of the proceeds, but it was on other accounts. No rent for the lands was ever paid to McCrary, to Walton, or to .P. N. Booker.

On April 4, 1876, another contract was entered into, signed severally by Sims, Harrison, P. N. Booker, E. W. Booker, and Wm. N. Knight. It was an agreement of sale by Sims & Harrison, the first clause being in the following language : "Articles of agreement made and entered into by and between Thos. W. Sims and Dempsy Harrison, comprising the firm of Sims & Harrison of Mobile, Alabama, and Parham N. Booker, Edmund W. Booker, and William N. Knight, respecting the purchase, cultivation, and management of the plantation in Hale county, known as the Peck place, formerly owned by John W. Walton." The agreement stipulates that, "The said Sims & Harrison hereby agree and contract to sell said lands to said Parham N. Booker and to place him in immediate possession of the same, and of all crops planted and growing thereon, and to make a good and sufficient conveyance of said lands to said Parham N. Booker, or to the assigns of his interest in this contract upon the full and complete payment by him or them of the purchase money for the same, as hereinafter stipulated ; and the said Sims & Harrison are to execute bond for title to said Booker, or his assigns accordingly." The agreement then provides for the payment by Booker of five thousand dollars cash, and the balance, about fourteen thousand seven hundred and forty-five dollars, in four annual installments, the last due January 1, 1880. It also provides for a mortgage on the premises and on the crops to be grown, to secure the deferred payments. It also contains the stipulation on the part of P. N. Booker that he will "retain the presence and services of Edmund W. Booker or William N. Knight on said lands, and in the management and cultivation of the same." This contract was transferred by P. N. Booker through his attorney in fact, "to Martha K. Booker, wife of Edmund W. Booker, and Eva H. Knight, wife of William N. Knight," by assignment expressing no consideration. The assignment bears date eight days before the date of the agreement, caused, probably, by the fact that the latter was transmitted from place to place, to receive the several signatures. We will treat them as contemporaneously executed.

The cash payment, five thousand dollars, was made to

Sims & Harrison, with the proceeds of the cotton grown on the Peck place in 1875, under the control and management of Booker and Knight as above set forth. The deferred payments to Sims & Harrison were also met and liquidated with the proceeds of cotton crops grown on the same place, under the same management. There is neither averment nor proof that P. N. Booker made any payment, unless what is stated above constitutes a payment by him; and there is neither averment nor proof that either Mrs. Booker or Mrs. Knight were the owners of any estate or property, unless what is stated above constitutes them such.

It is contended for appellants that P. N. Booker, in virtue of his trade with Walton of June 14, 1875, became the owner of the crop grown on the Peck place that year, and that the proceeds of this crop—five thousand dollars – entered into the purchase from Sims & Harrison. This, it is claimed, he had a right to give, and did give to Mrs. Booker and Mrs. Knight. The argument is sound, if the cotton belonged to P. N. Booker. Did it belong to him?

When Sims & Harrison redeemed the lands from Walton, that, by the very terms of the agreement, rescinded the contract of sale from Walton to P. N. Booker. The effect of rescission is to place the parties *in statu quo*, unless there be stipulations to the contrary.— *Gamble v. Gamble*, 11 Ala. 966. There is nothing in the contract between Walton and P. N. Booker which takes this transaction out of the operation of the general rule, but much to place it plainly within it. Booker had paid nothing, was absolved from all obligations to pay, and ceased to have any interest in the contract, while Walton was remitted to his status as it existed before the contract. As against Sims & Harrison he was entitled to the products and profits accruing between his purchase at mortgage sale and the redemption. As against Booker and Knight he was equally entitled, less their agreed compensation, for superintending the plantation; not to exceed one-third of the net profits of the cotton crop. There is no proof that Walton made any disposition of, or asserted any claim to the proceeds of the cotton crop, save the assertion of his lien in payment of another liability. The residue he left where it was. The first payment of the Sims & Harrison purchase, then, was made with cotton, two-thirds or more of which was the property of Walton, and the residue the property of Booker and Knight, grantors and covenantors of Mrs. Waller. The remaining payments, as we have shown, were made with the products of the identical land purchased and produced under the superintendence and management of Booker and Knight, the original pur-

chasers. Neither Mrs. Booker nor Mrs. Knight parted with anything valuable. They had nothing valuable to part with. If they bestowed any care, labor, attention, or solicitude on the business, they only bestowed what belonged to their husbands.—*McLemore v. Pinkston*, 31 Ala. 266; *Schaeffer v. Sheppard*, 54 Ala. 244; *Carleton v. Rivers, id.* 467; *Glaze v. Blake*, 56 Ala. 379.

There does not appear to have been any legal reason or useful purpose in employing the name of Parham N. Booker in the purchase or redemption of the land from Sims & Harrison. Throughout the transaction he seems to have been acting for others, paying nothing himself, and, so far as we can perceive, not contemplating the payment of anything. Both Booker and Knight testify that P. N. Booker purchased, not for himself, but for Mrs. Booker and Mrs. Knight. His name, therefore, may be eliminated from this record, and the transaction treated as if, in dealing with Sims & Harrison, the names of Mrs. Booker and Mrs. Knight had been used, instead of P. N. Booker. He seems to have been employed simply as an instrument or conduit.

In presenting a general view of this case, it is well not to lose sight of other significant facts. When Walton foreclosed his mortgage by a sale of the property, there was due him about eleven thousand of the twenty-six thousand dollars, agreed purchase-money. He realized his whole demand by himself, purchasing the property at the price of the balance due him. A month later he resold the property, not for cash, but in three annual installments; not for a speculation, but for the sum of the balance due him with interest. And both he and Sims & Harrison, in their contract of sale to P. N. Booker, stipulated that Booker and Knight should be retained in the possession and management of the plantation. It is manifest that in foreclosing, Walton was influenced by no desire of a speedy realization of the money due him, and that he was influenced by no feelings hostile to Booker and Knight. The whole transaction, from beginning to end, manifests a steadfast purpose on the part of Booker and Knight not to surrender or sacrifice the large payments previously made on the land, and to secure the property, not in the name of the original purchasers, it is true, but for the enjoyment of their families, themselves included.

To summarize: Booker and Knight purchased the lands in their own names at the agreed price of twenty-six thousand dollars; they paid on the purchase more than sixteen thousand dollars, of which Mrs. Waller, their sub-vendee, furnished six thousand dollars or more; the five thousand

dollars first paid to Sims & Harrison was the product of the entire plantation, under the superintendence of Booker and Knight, the portion of the land sub-sold to Mrs. Waller contributing its part. Of this five thousand dollars thus paid Booker and Knight for their services in producing it, were the owners of, say, one-third. The remainder belonged to Walton, but he abandoned it. He gave it to no one, so far as we are informed. Neither P. N. Booker nor the wives of Booker and Knight had any claim to it. The residue of the purchase-money was paid with crops grown on the entire plantation, including the lands sub-sold to Mrs. Waller, and under the superintendence and control of Booker and Knight.

We deem it unnecessary to collate the authorities bearing on the questions raised by this record. They will be found in the excellent briefs of counsel. The chancellor, in passing on the testimony, announced the following conclusions: "In case of a purchase by a wife during coverture, the burden is upon her to prove distinctly that she paid for the thing purchased with funds that were not furnished by the husband. Evidence that she purchased amounts to nothing, unless it is accompanied by clear and full proof that she paid for it with her own separate funds; not that she had the means of paying, but that she in fact paid. In the absence of such proof, the presumption is that her husband furnished the means of payment.—Bump. on Fraud. Con. 306. But there is no need of presumption here. The proof is clear and positive of the sources from which the funds were derived with which the payments were made. Neither is it anywhere shown that these ladies, or either of them were the owners of any separate estate with which to pay for the lands. The funds used were created and accumulated by the personal exertions, skill, and industry of their husbands, and on land, part of which had been conveyed to complainant by the husbands and their wives.

"If a wife has a separate estate, she may permit the husband in the enjoyment of the marital relation to live upon it, without rendering the products liable at law to his creditors on account of the labor which he voluntarily bestows upon it. But he can not create for her a separate estate (to the prejudice of those to whom he is under legal obligations.) He can not vest her with a separate estate even in her future earnings to the prejudice of existing creditors. *Pinkston v. McLemore*, 31 Ala. 308; *Carleton v. Rivers*, 54 *ib.* 467; *McAnally v. O'Neal*, 56 *ib.* 299.

"I am of the opinion that although the legal title to the lands described in complainant's bill is in Mrs. Martha K.

[Booker and Knight *et al.* v. Waller.]

Booker and Mrs. Eva H. Knight, in equity they are liable to be subjected to the creditors of E. W. Booker and W. N. Knight exisiting at the time of the conveyance. * * Said Booker and Knight, before the foreclosure by John W. Walton, having sold the lands described in the bill to the complainant, not at the time being vested with the legal title, and having since acquired the equitable right to the lands, are bound by the warranty contained in their conveyance. *Chapman v. Abrahams*, 61 Ala. 108."

We fully concur with the chancellor in all that is said above, and hold that the placing of the title in the wives under the circumstances disclosed in this record, is constructively fraudulent against the claim set up by Mrs. Waller. We therefore hold that the chancellor did not err in granting the relief to complainant.—*Early & Lane v. Owens*, 68 Ala. 171. We cite the following authorities without intending to affirm all that is said in them.—*Gamber v. Gamber*, 18 Penn. St. 363 ; *Keeny v. Good*, 21 *ib.* 349 ; *Hal'owell v. Horter*, 35 *ib.* 375 ; *Winter v. Walter*, 37 *ib.* 155 ; *Robinson v. Wallace*, 39 *ib.* 129 ; *Aurand v. Schaffer*, 43 *ib.* 363 ; *Gault v. Saffin*, 44 *ib.* 307 ; *Barringer v. Stiver*, 49 *ib.* 129 ; *Hause v. Gilger*, 52 *ib.* 412. We do affirm, however, that in such a case as this, it should require very strong proof to uphold the placing of the title in the names of the wives, who were without estates, and without the means of payment.

The case of *Sharp v. Sharp*, 76 Ala. 312, is not, in any thing decided therein, opposed to the views above-expressed. In that case, "no funds or earnings of his (the husband's) assisted in paying for the lands."

Other questions are raised by the assignments of error, many of which are not even noticed in the briefs of counsel. We will not notice them farther than to say there is nothing in them.—*Clark v. Smith*, 1 Saxton, (N. J.) 121 ; *Dougherty v. McColgin*, 6 Gill & J. 275 ; *Moore v. Cable*, 1 Johns. Ch. 385 ; *Russell v. Blake*, 2 Pick. 505 ; *Bell v. Mayer*, 10 Paige, 49 ; *Givens v. McCalmont*, 4 Watts, 460 ; 2 Lead. Cas. in Eq. II Part, 4 Amer. Ed. 2010.

The account for rents as taken by the register closes with the year 1884. The last decree, from which this appeal was prosecuted, was rendered in May, 1885. In June of that year the present appeal was taken. We are not informed whether that decree has been executed or not. If it has not been, and if Booker and Knight, or if Mrs. Booker and Mrs. Knight have remained in possession of the lands, there are two additional years—1885 and 1886—with the rents of which they should be charged. Should such be the case, a further report from the register will become nec-

[White v. Farley *et al.*]

essary. We therefore append a further conditional order of reference.

In this opinion we have re-affirmed the principles declared, when this cause was before us at a former term.

Affirmed, with conditional order of further reference.